# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| IN RE JEFFREY B. STEINBACK | 22-MC-2 CJW |
| | **MEMORANDUM OPINION AND ORDER** |

_____

## I. INTRODUCTION

This matter came before the Court on its own motion for attorney Jeffrey B. Steinback ("Steinback") to show cause why the Court should not hold him in contempt. The Court issued the show-cause order in *United States v. Murphy*, 20-CR-00006 (Doc. 59).[1]  For the reasons that follow, the Court finds Steinback in contempt of court and imposes appropriate sanctions.

## II. BACKGROUND

On January 8, 2020, a grand jury returned an indictment against Romel Murphy charging him with fraud-related offenses.  (Doc. 2).  On January 22, 2020, Steinback moved to appear pro hac vice as retained counsel, which the Court granted.  (Docs. 6, 7).  Trial was scheduled for the two week period beginning April 6, 2020.  (Doc. 14).

On March 9, 2020, defendant filed an unresisted motion to continue the trial.  (Doc. 16).  In that motion Steinback claimed he had "serious family health concerns he needs to be out of town for from March 11, 2020 to March 17, 2020."  (*Id.*, at 1).  The Court granted the motion, continuing the trial to June 1, 2020.  (Doc. 18).

On May 7, 2020, defendant filed a second unresisted motion to continue trial.  (Doc. 19).  In that motion, defendant asserted a need for a continuance because COVID-

---

[1] All references to docket entries pertain to case number 20-CR-00006.

19 restrictions prevented Steinback from meeting with his client in person. (*Id.*, at 1). Steinback represented that, "[b]arring any unforeseen extensions of [the COVID-19] restrictions, this will be our final request for a continuance[.]" (*Id.*, at 2). The Court granted the motion, continuing the trial to August 3, 2020. (Doc. 20).

On July 10, 2020, defendant filed a third unresisted motion to continue. (Doc. 21). This time, Steinback asserted the COVID-19 restrictions were still in place and prevented him from having in-person contact with his client. (*Id.*, at 1). The Court granted the motion, continuing the trial to October 5, 2020. (Doc. 22).

On September 15, 2020, defendant filed his fourth unresisted motion to continue. (Doc. 24). This time, Steinback cited COVID-19 restrictions, but also family health issues involving a brother suffering from cancer. (*Id.*, at 2). Steinback asserted "[t]his will be our final request for a continuance." (*Id.*). The Court granted the motion, continuing the trial to January 4, 2021. (Doc. 25).

On December 11, 2020, Steinback filed his fifth motion to continue trial. (Doc. 26). This time, Steinback again cited COVID-19 restrictions and the recent birth of a grandson. (*Id.*, at 2). On December 14, 2020, the Court denied the motion. (Doc. 27). The next day, defendant filed a notice of intent to plead guilty. (Doc. 29). The Court scheduled a change of plea hearing for December 21, 2020, cancelling the trial. (Doc. 30). On December 19, 2020, however, the Court continued the change of plea hearing and scheduled a status conference for December 28, 2020, to discuss scheduling the change of plea hearing. (Docs. 31, 32, 33). The Court then rescheduled the change of plea hearing for January 8, 2021. (Doc. 34).

On January 8, 2021, defendant Murphy entered a guilty plea before the Honorable Mark A. Roberts, United States Magistrate Judge. (Doc. 35). The Court accepted Mr. Murphy's plea on January 26, 2021. (Doc. 38).

On March 26, 2021, the United States Probation Office filed a draft presentence investigation report. (Doc. 40). Steinback did not file a timely objection to the draft report, so on May 4, 2021, the Court on its own motion found Steinback violated Federal Rule of Criminal Procedure 32(f)(1). (Doc. 42). In its order, the Court noted: "More troubling, counsel for defendant has apparently ignored repeated phone calls and emails from the United States Probation Officer bringing this violation to the attorney's attention. United States Probation Officers are extensions of the Court and snubbing a probation officer is the same as snubbing a federal judge." (*Id.*, at 1). The Court gave Steinback seven days to file objections to the draft presentence report. (*Id.*).

On May 21, 2021, the United States Probation Office filed the final presentence investigation report. (Doc. 44). The Court contacted counsel in an attempt to schedule the sentencing hearing for some time in August, but Steinback was unavailable, so the Court scheduled the sentencing hearing for September 24, 2021, noting that it would not be continued absent exceptional circumstances. (Doc. 45).

On September 16, 2021, Steinback filed an unresisted motion for an extension of time to file his sentencing memorandum, due the following day. (Doc. 46). The Court granted the motion, giving Steinback until September 20, 2021, to file his sentencing memorandum. (Doc. 47).

On September 23, 2021, Steinback's wife and legal assistant emailed the Court to advise that "Mr. Steinback is on his way to the emergency room due to violent back spasms and nerve pain," indicating it was unlikely he would be able to appear at the sentencing hearing the following day. (Doc. 95, at 2). The following morning, she emailed the Court claiming that Steinback "was given pain medication and anti-inflammatories/muscle relaxers last night and was instructed to limit any travel or physical activity for the next 4-7 days." (*Id.*, at 1). Also on September 24, 2021, an "emergency" motion to continue the sentencing hearing was filed. (Doc. 53). Over

3

Steinback's signature, it claimed that "Mr. Steinback was taken to the emergency room and was treated there. He was advised not to travel or participate in any strenuous physical activity for the next 4-7 days and was given medication for the spasms." (*Id.*, at 1). Relying on the veracity of these representations, the Court granted the motion, continuing the sentencing hearing to October 6, 2021, at 9:00 a.m. (Doc. 54). The notice was too late, however, for Steinback's client who had already traveled from Chicago to Cedar Rapids to attend his sentencing hearing scheduled for September 24, 2021.

On the afternoon of October 5, 2021, Steinback's wife called chambers and spoke with the Court's Judicial Assistant, telling her that Steinback met with a client who "seems to be positive" for COVID-19, that Steinback spoke with a doctor who advised him to self-quarantine, and asked for a continuance. At the Court's instruction, the Judicial Assistant emailed Steinback's assistant and advised that, absent Steinback testing positive for COVID-19, the Court would not continue the hearing. (Doc. 95-1, at 1).

At 5:01 p.m., on October 5, 2021, Steinback filed another "emergency" motion to continue the sentencing hearing, claiming that "he has been advised that he has had a direct exposure to a person with COVID-19 within the last 24-hours" and that his physician instructed him to self-quarantine. (Doc. 55). Attached was a doctor's letter, that stated that Steinback "had a possible exposure to COVID." (*Id.*, at 3). The motion violated Local Rule 7(k) because Steinback had not consulted with opposing counsel to represent opposing counsel's position.

On October 6, 2021, at 8:25 a.m., the Court denied the motion to continue the sentencing hearing. (Doc. 56). At 8:59 a.m., Steinback emailed a message to the presiding judge expressing his regret on having been ordered by his doctor not to travel because of his possible exposure to COVID-19, and asking the Court to continue the hearing. (Doc. 95-2).

4

Unlike his attorney, Mr. Murphy again appeared at the courthouse the day of the scheduled sentencing. Steinback did not appear. Thus, the Court had to reschedule the sentencing hearing again, this time for October 20, 2021. (Doc. 58).

On October 14, 2021, the Court issued a show cause order, scheduling the hearing to occur immediately after the rescheduled sentencing hearing. (Doc. 59). The order provided:

> As part of the show cause hearing, the Court orders defense counsel to produce ex parte for in camera inspection on or before October 18, 2021, the following documents:
> 1) all correspondence with defendant about defense counsel's attempt to continue and defendant's need to appear at the sentencing hearing set for October 6, 2021;
> 2) defense counsel's billing records for all clients for the dates of October 6, 2021, through October 11, 2021;
> 3) defense counsel's calendar entries for the dates of October 6, 2021, through October 11, 2021;
> 4) all medical records pertaining to defense counsel's "back spasms" that required a last-minute continuance of the sentencing hearing scheduled for September 24, 2021;
> 5) all medical records pertaining to defense counsel's evaluation and testing for COVID-19 in relation to the October 6, 2021 sentencing hearing.

(*Id.*, at 2).

On October 12, 2021, Steinback's assistant sent an email to the Court's assistant attaching a lab report that showed Steinback was tested on October 10, 2021, for COVID-19 and that results were negative. (Doc. 97).

On October 18, 2021, Steinback's assistant sent an email to the Court's assistant indicating that she was "still waiting on the doctor," she had "compiled a chronology of recent visits and recommendations, but have not been sent the requested letter from the doctor's office" and she would "send it as soon as we receive it." (Doc. 95-3).

5

After the sentencing hearing on October 20, 2021, the Court held the show cause hearing. (Doc. 62). At the hearing, Steinback provided the Court with: (1) typed documents purporting to reflect communication between Steinback's wife and Mr. Murphy, but they were not original documents or copies of text messages; (2) a typed statement declaring that there were no billing records between October 6, 2021, and October 11, 2021; (3) a typed statement that the only calendar entry for that time period was a Zoom proffer session; and (4) handwritten calendar entries for that time period. (Docs. 98, 98-1, 98-2). Steinback also provided the Court with a letter dated October 19, 2021, in which Dr. David Hansen stated: "Patient reports missing a work appointment on, 9/24/21, due to back spasms. If you have any questions or concerns, please don't hesitate to call." (Doc. 99, at 2). Steinback also provided the Court with medical records from November 2020, and July 2021, reflecting complaints of back pain, but no records from September 24, 2021. (Doc. 99).

During the hearing, the Court noted the documents Steinback provided and complained that they were not the actual billing records or original correspondence, as the Court ordered produced. (Doc. 89, at 7). As for Steinback's failure to produce medical records supporting his claimed visit to and treatment at an emergency room for his back spasms, the Court stated:

> Mr. Steinback, what that tells me regarding the September 24th is that—I'm highly skeptical that you went to the emergency room and had any instructions from any doctor not to appear—or not to travel. I find it absolutely unbelievable that you could not produce documents to demonstrate those medical treatments that you allege and that you told me in a court filing happened on those dates. I don't have any idea how you could not produce those documents when I gave you plenty of time to do so, if, in fact, they occurred. So I'm very troubled by that, and it makes me highly suspicious that you misrepresented a fact to this Court.

6

(*Id.*, at 8-9). The Court indicated that it was willing to continue the hearing to give Steinback time to produce the documents the Court originally ordered produced, including "documentation that demonstrates [Steinback] actually went into an emergency room and [was] treated on September 24th for back spasms and that some doctor actually gave [him] instructions not to travel in relation to that date," and "actual billing records, ledgers, and bills that [Steinback] actually sent to [his] clients" during the time period ordered, and "the actual source documents for the communication that [Steinback] had with [his] client regarding the October 6th hearing." (*Id.*, at 10).

Steinback replied that he found the Court skepticism of him, given his medical history, "to be difficult." (*Id.*, at 11). Steinback then claimed that

> [i]t was an urgent care facility rather than an ER. We went to the ER. It was backed up to the point where anybody who wasn't bleeding out of an artery wasn't going to be seen for about five hours, so we went to the urgent care center that was open, and I will be able to get whatever it is that is necessary.

(*Id.*, at 15). Steinback then claimed he contacted the facility to get documentation, but the facility was not cooperative. (*Id.*).

The Court granted Steinback another 30 days to obtain the records it ordered him to produce. (*Id.*, at 15-16). The Court reiterated that it still wanted "the original correspondence [Steinback] had with [his] client regarding the October 6, 2021" hearing. (*Id.*, at 16). Steinback responded that he believed they were texts and would produce them. (*Id.*).

On November 11, 2021, Mr. Murphy filed a pro se motion for appointment of counsel. (Doc. 67). In the motion, he stated: "I have three pertinent issues concerning my case and my previous attorney is busy with other cases and said he cannot handle them as well as me being unsatisfied with services rendered and I am unable to hire an attorney." (*Id.*). The Court appointed counsel for Mr. Murphy. (Doc. 69). That new counsel filed a motion for extension of the deadline for filing an appeal based in part on

the "apparent refusal of prior counsel to assist defendant in discussing a possible appeal." (Doc. 71, at 2).

More than 30 days passed after the show cause hearing and Steinback failed to produce any additional documents to the Court. Thus, on November 24, 2021, the Court entered an order for a further show cause hearing, again ordering him to produce the documents it ordered him to produce for the October 20, 2021 show cause hearing. (Doc. 76). The Court scheduled the continued show cause hearing for December 8, 2021. (*Id.*, at 3). The Court stated that it would "not consider any motions to continue or motions for extension of time." (*Id.*).

On December 7, 2021, Steinback's assistant sent an email to the Court asking to continue the show cause hearing. (Doc. 81). The Court had it filed as a motion to continue. In the email, Steinback's assistant claimed she failed to tell Steinback about the hearing until a few days ago and explained that his brother was experiencing grave medical issues. (*Id.*). The Court granted the motion, continuing the hearing to December 15, 2021. (Doc. 82).

On December 14, 2021, Steinback's assistant sent another email to the Court, asking for another continuance to allow more time to produce documents. (Doc. 84, at 3). Attached was a long letter from Steinback addressed to the Court relating his history of health problems. (*Id.*, at 5-10). As for the September 24, 2021 back spasm episode, Steinback claimed he went to a care clinic where "[a] triage doctor, possible an NP or a PA, conducted an evaluation, advising . . . to avoid physical activity and travel and offering a script for pain medication." (*Id.*, at 9). Steinback stated he declined the prescription. Steinback then stated that he tried to get records from the clinic but the staff was not helpful and no one claimed to know the name of the medical provider who evaluated him. (*Id.*). Also attached was a letter from Steinback's primary care physician, Dr. Hansen, stating that Steinback has a history of back pain and that Steinback told Dr.

Hansen that he had an episode recently causing him to miss court. (*Id.*, at 11). Dr. Hansen stated that Steinback told him that Steinback considered going to an emergency room, but instead decided to "tough-out his back pain flare-up at home with the help of medication." (*Id.*).

The Court again continued the hearing at Steinback's request, rescheduling it for January 10, 2022. (Docs. 83, 95-6).

On January 7, 2022, highly respected attorney Leon Spies entered his appearance on behalf of Steinback. (Doc. 92).

At the show cause hearing on January 10, 2022, the Court relayed the history of the matter up to that point and also expressed a concern about whether Steinback refused to file a notice of appeal on behalf of Mr. Murphy. (Doc. 106, at 2-6). Mr. Spies requested a continuance of the show cause hearing to allow time for Steinback to work with a lawyer who specializes in ethical issues and for her to issue a report identifying the issues she sees and a plan for addressing the issues. (*Id.*, at 8-9). Steinback also insisted on making a statement, which the Court insisted be made under oath. (*Id.*, at 9-10). The Court noted, however, that it was concerned that Steinback would likely only get himself into further trouble and relayed the concerns the Court had about Steinback's lack of candor. (*Id.*, at 10-14). Nevertheless, Steinback insisted on making a statement under oath. (*Id.*, at 14).

Steinback testified:

> By the time I got home from the emergency room trip to Rockford Memorial, which is 25 minutes at least from my house—and I didn't want to go there in the first place, but my wife, Patti, thought I might be having a kidney stone and I should go and see. Rather than continue to argue with her, I agreed. When it was too busy, I didn't want to go anywhere except home, get into a fetal position, and call it a day. Patti made a call. There's a series of urgent care centers that are hooked up with, I've come to learn, the Beloit medical association. It's an expansive group. Beloit is a city that's about 3 miles, maybe 4 miles from my home. Even though I live in

9

Illinois, it's right on the state line. They have these different urgent care clinics. Some of them are open later. Some of them are open—close sooner. Same thing happened there.

I had not given up on the prospect that if I took a muscle relaxer and laid still for four or five hours, I might be able to get there the next day. Romel had already left to be here, and he stayed overnight, so I couldn't stop him from coming even if I wanted to. And I was on the phone and he knew it. And he knew it when he came into this courtroom. And I suspect there might be something in the record to reflect that fact, but I haven't ordered that transcript.

That said, when we were at the urgent care center in—in Roscoe, part of that Beloit program, which was very frustrating to me, because I thought maybe someone would remember me, I—I didn't allow myself to get the—the Dilaudid shot, because once they learn that you've had kidney stones and you are complaining about pains through here, that's the first thing they give you. And Dilaudid makes me sick. I lose all sense of space and time. And if I had taken that shot, there would be no chance that I could recover for the next day. None. Not only that, when that dissipates from me, I become irritable for hours. I don't know why. It gives me a headache, makes me sick to my stomach. I didn't want it. And so Patti and I had an argument there, and I said, "I'm going. We're not doing this. I'm not going to let them give me this shot. We're out." And I went home, which is where I wanted to be in the first place.

I took—I had an old scrip for Flexeril. I had previously taken ibuprofen. That didn't work. The Flexeril made me very sleepy, but I was still in pain. Although I was tired, I was—it was a—a pain that I cannot describe in words. Crippling doesn't quite get to it. I ultimately took a half a pain pill, a—something called Vicoprofen. That knocked me out. I was out. I don't know if that was midnight, 1:00 in the morning. I don't remember when that was. I—I tried to rack my brain about that.

And at some point, Patti reached out to Your Honor's deputy clerk; Patti reached out to Kyndra [the prosecutor]; apparently sent e-mails. Somewhere along the line there was a motion that was put together. I do not let motions go out unless I have read them, even simple ones, even straightforward ones. I neither wrote, read, nor signed that document. And I did not want to get into that with Your Honor, because I'd rather die. I'd rather Your Honor throw me into jail than have anybody think anything untoward about my wife. And all she was doing was the best she could. That's it. Somehow she cobbled together this motion. Every time I go in

10

a spin, countless times, the doctors say the same thing, "Rest. We'll give you a scrip."

"No, I don't need a scrip. I have a scrip from before."

Or, if they think it's the kidney stone, the Dilaudid shot.

I've heard it a hundred times, more than a hundred times, for real. Patti wrote that in there. Not me. I never made a representation to Your Honor, much less a misrepresentation.

When I was awakened the next morning, Patti said, "The case has been continued." I—I—I said a little prayer to myself, and I fell back to sleep, and did not know that this motion was written or of any kind of an issue at all until after the fact.

Your Honor can do whatever Your Honor feels is appropriate. And if you think I'm lying, then do whatever it is that you want. But I will not sit still and be called a liar or be challenged about—dared to take the stand, because it's likely I will be found to have perjured myself when I haven't. And that's the truth.

And the—there is no one who can say that I had anything to do with that motion. I was—I wish I did, because I wouldn't have sent that. I wouldn't have needed it. I sent you all the information I sent you, Your Honor, because I wanted the Court to know this is no joke, what I deal with. And if I didn't have a half a dozen people who eat and have a roof over their heads because I continue to work, I'd stop, because my body has said to do that a long time ago. But that's how I take my responsibilities, my commitments.

And the—I had told my wife that I will tell the Court what happened. She doesn't have to. But even in the December 7, 2021 e-mail, which I only reread recently, to—it says, "Dear Sali [the Court's Judicial Assistant]." At the very end, my wife says, "Again, I am very sorry for my part in making a difficult situation worse. That was never my intention for Jeff, and absolutely not for the Court." Your Honor can take the pieces of what has happened here, and that's—that's just the way it occurred. Now, we haven't had a good night's sleep between us since this has happened, because my wife thinks she got me in trouble. Well, ultimately, at the end of the day, everything that happens, regardless of circumstances, I take responsibility for with respect to my practice, and I've never been different. I've made mistakes in the past, and I've owned them. I will not own a mistake I did not make, or that I was aware of. I never made a misrepresentation to Your Honor about anything. I wasn't even involved in the making of that motion. There is nothing in any of this that would

11

suggest to the contrary. All of these exchanges was while I was unconscious, and I regret the fact that I couldn't be awakened so that I could have looked at this and stopped this from ever happening. That is the God's honest truth.

(*Id.*, at 16-21).

The Court tried to get a clarification by asking if Steinback "actually step[ped] foot inside that urgent care facility?" (*Id.*, at 21). Steinback said he did and spoke to a person in "triage," but denied that that person took his name or any identification information. (*Id.*, at 22-23). Steinback stated "I didn't say that I have been treated." (*Id.*, at 23). Steinback explained that at the October 20, 2021 hearing he told the Court he "went" to the urgent care facility. (*Id.*, at 26). Steinback denied again claiming he was treated there and denied trying to leave the Court with the impression that he had. (*Id.*). Steinback agreed that the Court had given him ample notice and opportunity to explain all this to the Court at the October 20, 2021 hearing, but he did not. (*Id.*, at 26-27).

The Court also asked Steinback if Mr. Murphy asked him to file an appeal on his behalf. (*Id.*, at 29). Steinback denied that, and claimed to have "exchanges with him," suggesting texts or email exchanges. (*Id.*).

Mr. Spies requested more time, four months, to produce the original communications Steinback had with his client about the continuation of the October 6, 2021 sentencing, and to produce the report from the ethics expert Mr. Spies had hired to counsel Steinback. (*Id.*, at 34). The Court granted that request, rescheduling the hearing for May 20, 2022. (Doc. 103).

On May 4, 2022, Mr. Spies filed a motion to withdraw as counsel for Steinback. (Doc. 107). The Court granted the motion. (Doc. 108).[2]

---

[2] That Mr. Spies, a highly ethical, well-respected, and very patient attorney moved to withdraw from representing Steinback speaks volumes to the Court.

On the afternoon of May 18, 2022, Steinback emailed a three-page letter to the Court "seeking forgiveness for the short-sighted, wrong-headed, and reflecting back, at times misleading way in which I have conducted myself before this Court." (Doc. 111, at 1). In the letter, Steinback went on to recount his back spasm history, discussed other medical issues, and his efforts to hire a new attorney, among other things. (*Id.*, at 1-3). In relation to the September 24, 2021 continuance, Steinback again stated that "[a]spects of my written response were unclear or, on review, misleading" as were "[a]spects of my response to some of Your Honor's inquiries were likewise either misleading, or at best, confusing." (*Id.*, at 3). Steinback ultimately asked for a 30-day continuance of the May 20, 2022 show cause hearing to allow him time to find new counsel and a 60-90-day continuance to obtain further medical treatment. (*Id.*, at 3). The Court filed Steinback's letter as a motion to continue, and then promptly denied it. (Doc. 112).

On May 20, 2022, Steinback appeared for the show cause hearing. He was unrepresented. The Court asked Steinback if he had any documents to produce to the Court in response to the Court's orders. He produced two documents.[3] One was a letter from a former employee stating that Steinback had her assist him to create a new system of organization for him. (Doc. 113-1). The other document was a letter from Dr. Adam Hutton stating that he notified Steinback that his patient with whom Steinback had contact had tested positive for COVID-19. (Doc. 113-2).

The Court asked about the original communication Steinback had with Mr. Murphy about the continuation of the October 6, 2021 hearing. Steinback stated that they were text messages and that his assistant had sent him "the exact texts" and that the content was the same as what she had typed up previously except for one additional text between Steinback and Mr. Murphy later that evening. Yet, Steinback had not produced

---

[3] There is no transcript for this hearing. The facts here are based on the Court's memory and contemporaneous notes.

the exact texts to the Court in compliance with its repeated orders to do so. When asked if he could produce them to the Court at the hearing, Steinback said he could not.

The Court asked Steinback if he had additional medical records or documents supporting his claim that he sought medical treatment for back spasms on September 24, 2021. He stated he did not.

The Court asked Steinback if he had records of communication with Mr. Murphy about whether Mr. Murphy requested, and Steinback refused to file, a notice of appeal on Mr. Murphy's behalf. Steinback stated the communication was by phone and he had no records of communication with Mr. Murphy about an appeal that Steinback could produce to the Court.

Steinback accepted the Court's offer to make any further statement he wished to make. Steinback admitted the statements made in his September 24, 2021 motion to continue were not true. He again claimed never to have seen or approved the filing of the motion. He admitted knowing when he saw the motion that it was not true. Yet, he explained that he was not prepared for the show cause hearing and asked for more time to try to figure out what his assistant/wife had done.

At the conclusion of the hearing, the Court announced that it found Steinback in civil contempt of court for failing to comply with court orders, for lack of candor with the Court, and for misleading the Court.

## III. DISCUSSION

The Court begins with the finding that Steinback disobeyed court orders, was not candid with the Court, and misled the Court. The Court stops short of finding he committed perjury.

Here, Steinback repeatedly disobeyed Court orders. Steinback was ordered to appear at the sentencing hearing on October 6, 2021. He was informed through email communication with his staff that the Court would not continue the sentencing hearing

14

absent Steinback testing positive for COVID-19. Nevertheless, he filed a motion to continue after hours. The Court denied the motion. Yet, Steinback willfully chose not to appear at the hearing. His client did.

The Court also repeatedly ordered Steinback to produce documents and he failed to comply as ordered. He could not ultimately produce medical records showing he was treated for back spasms on September 24, 2021, because that was a lie from the beginning. He still claims to have visited an urgent care facility and was seen by a person there, yet he has failed to produce documents showing that to be true. The Court finds that it is not. Had Steinback talked to a care provider as he claimed, the first step the facility would have taken would have been to get identification from Steinback and enter him into their system, if for no other reason than to collect insurance. The fact that Steinback has produced no records, no witness, no evidence whatsoever to support his evolving story of treatment for his alleged back spasms on September 24, 2021, leads the Court to the inescapable conclusion that he never went to see anyone that day about his back spasms, even assuming he had them.

The Court also ordered Steinback repeatedly to produce original documents showing his communication with Mr. Murphy about the continuance of the October 6, 2021 sentencing hearing. Steinback repeatedly failed to comply. At the last hearing, he admitted that his assistant provided him with screenshots of the text messages, yet he did not produce those to the Court. Again, the conclusion the Court reaches is that there was information in the text messages that was not favorable to Steinback and he would rather incur the Court's wrath for not producing them than to produce them and let the Court know what they contain. The Court finds Steinback willfully disobeyed the Court's order in refusing to produce the documents.

Last, the Court ordered Steinback to produce documents he claimed he had that would show that he did not refuse to file a notice of appeal for Mr. Murphy. Steinback

claims that all communication about the matter was by phone. Yet, he produced no documents that would even support that claim.

As for lack of candor and misleading the Court, in his May 18, 2022 letter, Steinback admitted he was misleading. Steinback claims he never saw or approved the filing of the September 24, 2021 motion to continue the sentencing hearing that contained the lie that he was treated at an emergency room for back spasms, prescribed medications, and instructed not to travel. He claimed that his assistant/wife filed the pleading without his knowledge or permission. Yet, Steinback did not have his wife testify or provide a sworn statement to that effect, nor produce any other evidence to support his claim of ignorance. The Court doubts it is true. The Court suspects that Steinback fully knew about and approved the filing of the motion.

Regardless, when Steinback appeared at the October 20, 2021 show cause hearing he had an opportunity at that time to fully clarify matters and reveal the truth. He admitted that he knew the claims in the September 24, 2021 motion to continue were not true, yet he did not reveal that to the Court. He could have told the Court then that he was never treated or prescribed medication for back spasms on September 23, 2021, or told he should not travel. Instead, Steinback doubled-down by claiming he "went" to an urgent care facility, not an emergency room, and claimed he could produce documents to the Court to prove it. By his crafty wording, Steinback clearly intended to leave the Court with the impression that he was still treated and prescribed medication and ordered not to travel; the only difference was that it occurred at an urgent care facility and not an emergency room.

This Court has inherent authority to sanction attorneys for violating court orders. In *In re McMinn*, No. 02-4066MC, 2002 WL 31972352 (N.D. Iowa Nov. 25, 2002), this Court discussed at length the law that provides this Court authority to impose sanctions.

16

This court has the inherent authority to sanction lawyers who willfully and intentionally violate its lawful orders. This authority arises from the power of federal courts to exercise those inherent powers which "are necessary to the exercise of all others," *United States v. Hudson*, 7 (11 Cranch) U.S. 32, 34, 3 L.Ed. 259 (1812), and includes the authority to sanction counsel "who willfully abuse [the] judicial process." *See United States v. Dubon–Otero*, 98 F. Supp.2d 187, 191 (D. P.R. 2000) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766, 100 S. Ct. 2455, 65 L.Ed.2d 488 (1980); *In re Cordova Gonzalez*, 726 F.2d 16, 20 (1st Cir. 1984) (using the court's inherent power to sanction an attorney in a criminal case who withdrew representation eight days before trial); *Ramos Colon v. United States Attorney for Dist. of P.R.*, 576 F.2d 1, 3 (1st Cir. 1978) ("the inherent power of the court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it.") (quoting *Flaksa v. Little River Marine Constr. Co.*, 389 F.2d 885, 888 (5th Cir. 1968)); *United States v. Kouri–Perez*, 8 F.Supp.2d 133, 140 (D. P.R. 1998) (reprimanding defense counsel for inappropriate behavior).

In an order entered by a three-judge panel in *In re Attorney Clifford R. Cronk III*, Misc. No. M1–20 (S.D. Iowa) ("Cronk"), the court held as follows:

> This court has "the power to control admission to its bar and to discipline attorneys who appear before it." *Chambers v. Nasco*, 501 U.S. 32, 43 (1991). *See also In re Snyder*, 472 U.S. 634, 643 (1985); *In re Caranchini*, 160 F.3d 420, 423 n. 3 (8th Cir. 1998); *In re Attorney Discipline Matter*, 98 F.3d 1082, 1087 (8th Cir. 1996); *Adduono v. World Hockey Ass'n*, 824 F.2d 617, 622 (8th Cir. 1987). "Courts have long recognized their authority to suspend or disbar attorneys, an inherent power derived from the attorney's role as an officer of the court that granted admission." *In re Hoare*, 155 F.3d 937, 940 (8th Cir. 1998).

*Id.*, at 18–19.

When a defense lawyer willfully violates a discovery order in a criminal case, the appropriate sanction is to impose a punishment directly on the lawyer. *People v. Foster*, 271 Ill.App.3d 562, 567, 648 N.E.2d 337, 340 (1995). *See Taylor v. Illinois*, 484 U.S. 400, 433, 108 S. Ct. 646, 665, 98 L.Ed.2d 798 (1988) (Justice Brennan dissenting) (sanctioning defense attorney for willful discovery violation in criminal case is effective

17

in deterring future violations of court's discovery orders). *See also State v. Stradley*, 127 Idaho 203, 899 P.2d 416 (1995) (upholding monetary sanction of public defender for violation of court's discovery orders).

Furthermore, in this case, Ms. McMinn was at all material times subject to the Iowa laws and rules governing professional conduct. *See* Local Rule 83.2(g). Therefore, the court can look to the Iowa Code of Professional Responsibility for Lawyers to judge her actions. The misconduct at issue implicates at least two sections of that Code: DR 1–102(A)(5) (conduct prejudicial to the administration of justice), and DR 7–102(A)(8) (conduct contrary to a disciplinary rule).

2002 WL 31972352, at *4. *See also Gallagher v. Magner*, 619 F.3d 823, 844 (8th Cir. 2010) (citing *Chambers* and holding that a district court has inherent authority to sanction an attorney for abuse of the judicial process); *In re Bagdade*, 334 F.3d 568, 570-71 (7th Cir. 2003) (finding sanctions appropriate under appellate rules when attorney misled the court); *In re Bragg*, No. 1:11CR00026-002, 2012 WL 566958, at *2 (W.D. Va. Feb. 21, 2012) (finding the court has inherent authority to impose sanctions against a defense attorney who violated a discovery order by releasing discovery documents). Indeed, the Court could impose criminal sanctions were it to choose to find Steinback in criminal contempt. *See United States v. Britton*, No. 10-CR-20090, 2012 WL 6047983, at *6 (C.D. Ill. Dec. 5, 2012) (finding attorney in criminal contempt of court for willfully violating a court order, willfully making false statements in his motion to continue, and willfully providing false testimony before the court).[4]

---

[4] The Court finds that it does not have power to sanction Steinback under Rule 11 of the Federal Rules of Civil Procedure. There appears to be no authority for the proposition that that civil rule would apply in a criminal proceeding. In *United States v. Hawley*, 768 F.2d 249, 252 (8th Cir. 1985), a criminal case where an attorney filed frivolous and malicious motions, the Eighth Circuit Court of Appeals "encourage[d] the district court to impose appropriate sanctions under [ ] Rule [11] if a similar situation arises in the future." Nevertheless, that appears to have been incorrect advice. *See Sanctions Under Federal Rule of Civil Procedure* 11, C497 ALI-ABA 1, 125 (Mar. 22, 1990) (stating the advice in *Hawley* was incorrect).

The question now becomes determining the appropriate sanction to be imposed for the violation of the Court's orders and for Steinback's lack of candor and misleading the Court. A district court's inherent power to impose sanctions against an attorney "must be exercised with restraint and discretion," but allows for district courts "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44–45. *See also Harlan v. Lewis*, 982 F.2d 1255, 1262 (8th Cir.1993) (citing *Chambers*, 501 U.S. at 44–45) (holding that, because of the potency of inherent powers, "[a] court must exercise its inherent powers with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction.").

In determining the appropriate sanction to be imposed in this case, the Court begins with the recognition that, above all people, lawyers should recognize the need to strictly comply with court orders. Here, Steinback repeatedly and willfully violated the Court's orders. More troubling still is Steinback's lack of candor and misleading behavior with the Court. Steinback knew that false representations were made to the Court about the need for a continuance and that they were made under his name. Yet, only through repeated prodding and pushing by the Court over the course of three hearings did Steinback eventually admit the statements were not true. As noted above, the Court is convinced that Steinback has still not told the truth about the events surrounding his motion to continue the September 24, 2021 sentencing hearing.

Steinback's conduct also substantially interfered with the Court's schedule. The Northern District of Iowa is a small district with one of the heaviest per-judge caseloads in the country. Scheduling hearings and keeping up on the docket in an effort to provide all people with timely resolution of their cases is exceedingly difficult. When Steinback repeatedly filed motions to continue hearings at the last minute for what the Court now finds to be under frivolous or false pretenses, it disrupts the Court's schedule. Because

19

these continuances occurred at the last minute, it prevented the Court from hearing other parties' disputes in their place.

Last, and not insignificantly, is the impact Steinback's conduct had on his own client. Facing sentencing in federal court is a daunting and disturbing experience for anyone. Here, Steinback's client, Mr. Murphy, lived in Chicago, approximately four hours from this courthouse. Twice Mr. Murphy had to steel himself to face a federal sentencing hearing and travel to the courthouse, only to find out that his attorney failed to appear and the hearing was continued, not because of anything to do with Mr. Murphy, but because of Steinback's personal issues. Steinback's utter disregard for the welfare of his client is reprehensible.

Weighing these considerations, it is the Court's judgment that the appropriate sanction in this case is:

1. A public reprimand in the form of this order;

2. Steinback must not again practice law before this Court without express written permission from the Chief Judge for the United States District Court for the Northern District of Iowa;

3. Steinback is fined $5,000.00, payable immediately to the Clerk of Court for the Northern District of Iowa;

4. The Clerk of Court is directed to send copies of this opinion, together with the documents at docket numbers 16, 19, 21, 24, 26, 42, 46, 53, 54, 55, 56, 58, 59, 67, 71, 76, 81, 83, 84, 89, 92, 95, 95-1, 95-2, 95-3, 95-4, 95-5, 95-6, 97, 98, 98-1, 98-2, 99, 103, 106, 111, 112, 113-1, and 113-2 to the Attorney Registration and Disciplinary Commission of Illinois and to the Clerk of Court for the United States District Court for the Northern, Central, and Southern Districts of Illinois, bar number 2718189.

**IT IS SO ORDERED** this 6th day of June, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa